**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| PENNACO ENERGY, INC., MARATHON OIL COMPANY, and DEVON ENERGY CORPORATION, )<br><br>Petitioners, )<br><br>STATE OF WYOMING, YATES PETROLEUM CORPORATION, ANADARKO PETROLEUM COMPANY, NANCE PETROLEUM CORPORATION, WILLIAMS PRODUCTION RMT COMPANY, CARLTON DEWEY, MIKE COULTER, JESS ANDERSON, JOANN TWEEDY, and CHARLES TWEEDY, )<br><br>Intervenor Petitioners, )<br><br>vs. )<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ROBERT ROBERTS, in his official capacity as REGIONAL ADMINISTRATOR, REGION 8, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, )<br><br>Respondents, )<br><br>STATE OF MONTANA, TONGUE RIVER WATER USERS' ASSOCIATION, POWDER RIVER BASIN RESOURCE COUNCIL, )<br><br>Intervenor Respondents. ) | FILED<br>U.S. DISTRICT COURT<br>DISTRICT OF WYOMING<br><br>OCT 1 3 2009<br><br>Stephan Harris, Clerk<br>Cheyenne<br><br><br><br>Case No. 06-CV-100-B<br>*Consolidated with*<br>06-CV-228-B<br>06-CV-229-B<br>06-CV-235-B |

## **ORDER**

This matter came before the Court for an administrative review hearing on July 9-10, 2009. Brent R. Kunz and John C. Martin represented Pennaco Energy, Inc., Marathon Oil Company, Devon Energy Corporation, St. Mary Land & Exploration Company (formerly Nance Petroleum), and Yates Petroleum Corporation (collectively "Industry"). Michael B. Wigmore and Corrine E. Rutledge represented Anadarko Petroleum Corporation (Anadarko). Jay A. Jerde represented the State of Wyoming (Wyoming). Keith S. Burron represented Williams Production RMT Company (Williams Production). Jennifer A. Golden represented Carlton Dewey, Mike Coulter, Jess Anderson, and Joann and Charles Tweedy. Alan D. Greenberg and Nicholas Vassallo represented the United States Environmental Protection Agency and Robert Roberts, Regional Administrator, Region 8 (collectively "EPA"). Sarah A. Bond and Gay Woodhouse represented the State of Montana (Montana). Brenda Lindlief-Hall and Timothy C. Kingston represented Tongue River Water Users' Association. Kate M. Fox represented Powder River Basin Resource Council.

The Court has jurisdiction over this administrative review action under 5 U.S.C. §§ 701-706 and 28 U.S.C. § 1331. The Court reviews the action in

accordance with U.S.D.C.L.R. 83.7.2 and Fed. R. App. P. 15. Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994) ("Reviews of agency action in the district courts must be processed as appeals. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure.").

## I.   PROCEDURAL BACKGROUND

In 2003, the Montana Board of Environmental Review (Board) revised its water quality standards regulating electrical conductivity (EC) and sodium adsorption ratio (SAR) for the Tongue River, Powder River, Little Powder River, Rosebud Creek and their tributaries. (R. 00920, 00929-31.) In 2006, the Board revised the standards again. (R. 09247.) Montana promulgated both sets of revisions to address water quality impacts of coal bed methane development in the Tongue River, Powder River and Little Powder River Watersheds.

The EPA approved the 2003 revisions on August 28, 2003. (R. 00983-91.) The EPA approved the 2006 revisions on February 29, 2008. (R. 10868-72.)

Petitioners and Intervenor Petitioners (collectively "Petitioners") have asked the Court to review the EPA's approval of both the 2003 and the 2006

3

water quality regulations adopted by the State of Montana. The Petitioners

contend that the EPA's actions approving the revisions violate federal law,

including the Administrative Procedure Act (APA) and the Clean Water Act.[1]

## II. STATUTORY AND REGULATORY BACKGROUND

### A. FEDERAL

---

[1] Four separate actions were filed seeking review of the EPA's final agency actions concerning Montana's revisions of its regulations. The four actions have been consolidated into this case. In April 2006, Pennaco Energy, Incorporated, Marathon Oil Company, and Devon Energy Corporation (collectively "the Pennaco group") filed a petition for review challenging the EPA's approval of the 2003 revised standards. (Case No. 06-CV-100.) In September 2006, the State of Wyoming, the Pennaco group along with Yates Petroleum Corporation and Nance Petroleum Corporation, and Anadarko Petroleum Corporation (Anadarko) each filed a petition for review challenging the EPA's failure to take action on Montana's 2006 revised standards. The State of Wyoming's petition was docketed as Case Number 06-CV-228, the Pennaco group, Nance and Yates' petition was docketed in Case Number 06-CV-229, and Anadarko's petition was docketed in Case Number 06-CV-235. On September 22, 2006, this Court consolidated Case Numbers 06-CV-228, 06-CV-229 and 06-CV-235 under Case Number 06-CV-100. (Case No. 06-CV-228, docket nos. 7, 29.) The Court stayed the proceedings in January 2007, to allow the parties an opportunity to mediate their disputes. (Case No. 06-CV-100, docket no. 137.) The parties were unable to reach a final agreement. (Case No. 06-CV-100, docket no. 155.) On February 29, 2008, the EPA approved the 2006 revised standards. (R. 10868-72.) In April 2008, the Pennaco group and Nance and Yates filed an amended and consolidated petition for review challenging the EPA's approval of Montana's 2003 revised standards and Montana's 2006 revised standards. (Case No. 06-CV-100, docket no. 158.) The State of Wyoming and Anadarko also filed amended and consolidated petitions for review challenging the EPA's approval of the 2003 and 2006 revised standards. (Case No. 06-CV-100, docket no. 166, 168, 181.)

4

The Federal Water Pollution Control Act, now codified at 33 U.S.C. §§1251 et seq., was enacted in 1948 to provide a means of controlling water pollution in the United States. Ann K. Wooster, Annotation, Actions brought under Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act) (33 U.S.C.A. §§ 1251 et seq.) -- Supreme Court Cases, 163 A.L.R. Fed. 531 (2000). Since 1948, the act has been extensively amended. In 1977, its popular name was changed to the "Clean Water Act". 61C Am. Jur. 2d, Pollution Control, § 718.

The Clean Water Act is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." PUD No. 1 of Jefferson County v. Wash. Dept. of Ecology, 511 U.S. 700, 704 (1994) (quoting 33 U.S.C. § 1251(a)). To achieve this goal:

> . . . Congress prohibited the discharge from a point source of any pollutant into the waters of the United States unless that discharge met specific requirements set forth in the Act. 33 U.S.C. § 1311(a). "Point source" is defined by the Act to mean: "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Further, a "pollutant" is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

> In order for point source discharges to be in compliance with the
> Act, such discharges must adhere to the terms of a National
> Pollutant Discharge Elimination System ("NPDES") permit issued
> pursuant to the Act. 33 U.S.C. § 1342. NPDES permits are issued
> by the EPA or, in certain jurisdictions, by state agencies authorized
> to do so by the EPA. 33 U.S.C. § 1342(a)-(d). Unlike point source
> discharges, nonpoint source discharges are not defined by the Act.
> One court has described nonpoint source pollution as "nothing more
> that a [water] pollution problem not involving a discharge from a
> point source." Nat'l Wildlife Federation v. Gorsuch, 693 F.2d 156,
> 166 n. 28 (D.C. Cir.1982) (internal quotation marks omitted).
>
> Rather than vest the EPA with authority to control nonpoint source
> discharges through a permitting process, Congress required states
> to develop **water quality standards for intrastate waters**. 33
> U.S.C. § 1313.

American Wildlands v. Browner, 260 F.3d 1192, 1193-94 (10th Cir. 2001) (bold

added).

The water quality standards which Congress required the states to

develop must include three elements: (1) first, each water body must be given

a "designated use," such as recreation or the protection of aquatic life; (2)

second, the standards must specify for each body of water the amounts of

various pollutants or pollutant parameters that may be present without

impairing the designated use; and (3) third, each state must adopt an

**antidegradation review policy** which will allow the state to assess activities

that may lower the water quality of the water body. American Wildlands, 260

6

F.3d at 1194 (citing 33 U.S.C. § 1313(c)(2)(A) and 40 C.F.R. §§ 130.3, 130.10(d)(4), 131.6, 131.10, 131.11) (bold added).[2]

An antidegradation (or nondegradation) policy is "a policy requiring that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation." 33 U.S.C. § 1313(d)(4)(B). See also PUD No. 1 of Jefferson County, 511 U.S. at 705. The EPA's regulations implementing the Clean Water Act require each State to "develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy." Kentucky Waterways Alliance v. Johnson, 540 F.3d 466, 471 (6th Cir. 2008) (citing 40 C.F.R. § 131.12(a)). The EPA regulations further provide that "[t]he antidegradation policy and implementation methods shall, at a minimum, be consistent with" certain federal standards provided for in the regulation. Id. (citing 40 C.F.R. § 131.12(a)).[3]

_____

[2]Further, each state is required to identify all of the waters within its borders not meeting water quality standards and establish "total maximum daily loads" ("TMDL") for those waters. A TMDL defines the specified maximum amount of a pollutant which can be discharged into a body of water from all sources combined. American Wildlands, 260 F.3d at 1194 (citing 33 U.S.C. § 1313(d)).

[3]The federal antidegradation standards establish three levels of water quality protection: Tier I, Tier II, and Tier III. 40 C.F.R. § 131.12(a). Tier I protection establishes the minimum water quality standard for all of a State's waters and requires that "[e]xisting instream water uses and the level of water quality

7

Once a State adopts or revises its water quality standards, including its

antidegradation policy, the Clean Water Act requires the State to submit these

standards to the EPA for a determination as to whether the new standard is

consistent with the act. American Wildlands, 260 F.3d at 1194 (citing 33 U.S.C.

§ 1313(c)(2)).  If the State's standards and implementation procedures are

---

necessary to protect the existing uses shall be maintained and protected."
Kentucky Waterways Alliance, 540 F.3d at 471 (citing 40 C.F.R. §
131.12(a)(1)).  Tier II protection applies when "the quality of the waters
exceed levels necessary to support propagation of fish, shellfish, and wildlife
and recreation in and on the water." Id. (citing 40 C.F.R. § 131.12(a)(2)). For
such waters, the regulation requires that their "quality shall be maintained and
protected unless the State finds, after full satisfaction of the intergovernmental
coordination and public participation provisions of the State's continuing
planning process, that allowing lower water quality is necessary to
accommodate important economic and social development in the area in which
the waters are located." Id. (citing 40 C.F.R. § 131.12(a)(2)). However, "[i]n
allowing such degradation or lower water quality, the State shall assure water
quality adequate to protect existing uses fully." Id. (citing 40 C.F.R. §
131.12(a)(2).  The Tier II standard may also be described as protecting the
water body's "assimilative capacity" which is the amount by which the water
body exceeds the quality level necessary to support its designated uses.
Kentucky Waterways Alliance, 540 F.3d at 471, n. 4. Under the regulation, a
pollution increase that would decrease a water body's assimilative capacity
would need to be justified by the necessity of the pollution for achieving
important economic and social development. However, the regulation prohibits
any pollution increase that would create negative assimilative capacity,
regardless of the economic or social necessity for the pollution." Id. Tier III
protection provides that "[w]here high quality waters constitute an outstanding
National resource, such as waters of National and State parks and wildlife
refuges and waters of exceptional recreational or ecological significance, that
water quality shall be maintained and protected." Id. (citing 40 C.F.R. §
131.12(a)(3)).

consistent with the minimum federal standards required by the Act and the EPA's implementing regulations, then the EPA must approve the state standards within sixty days. Kentucky Waterways Alliance, 540 F.3d at 471 (citing 33 U.S.C. § 1313(c)(3)). However, if the state water quality standards do not satisfy the Act's requirements, the EPA must, within ninety days, "notify the State and specify the changes to meet such requirements. If such changes are not adopted by the State within ninety days after the date of notification, the [EPA] shall promulgate such standard[s]." Id. at 472 (citing 33 U.S.C. § 1313(c)(3)).

To simplify then, the Clean Water Act provides for two sets of water quality measures. First, the EPA establishes and enforces limitations on discharges from point sources. To discharge, an individual must obtain a permit from the EPA or an EPA-authorized state agency. Second, states must promulgate water quality standards for intrastate waters. These standards must have three elements: (1) states must give each body of water a "designated use"; (2) states must specify for each body of water the amounts of various pollutants or pollutant parameters that may be present without impairing the designated use; and (3) states must adopt a nondegradation policy which allows the state to assess activities that may lower the quality of

9

the water body.

## B.    MONTANA

The State of Montana administers the National Pollutant Discharge Elimination System and issues permits for point source discharge of pollutants. Mont. Code Ann. § 75-5-402.  Montana has also adopted a nondegradation policy as required by the Clean Water Act.  Mont. Code Ann. § 75-5-303.  The policy protects existing uses and prohibits the degradation of high-quality waters unless the degradation is consistent with the Clean Water Act.  Id.

Water quality can be thought of as a measure of the suitability of water for a particular use based on selected physical, chemical, and biological characteristics, called parameters.  A Primer On Water Quality, available at http://pubs.usgs.giv/fs/fs-027-01/; Mont. Code Ann. § 75-5-103(22).   To determine water quality, scientists measure and analyze characteristics of the water such as temperature, dissolved mineral content and number of bacteria. Selected characteristics are then compared to numeric standards and guidelines to decide if the water is suitable for a particular use.  Id.  The numeric water quality and the nondegradation rules are separate components of Montana's

water quality standards.[4] (R. 09247.) Each component serves an independent function. The function of a numeric standard is to quantify for a given pollutant the level determined to be protective of designated uses, whereas the purpose of a nondegradation rule is to protect the increment of "high quality" water that exists between ambient water quality and a numeric water quality standard. Id.

Degradation is defined by Montana as a change in water quality that lowers the quality of **high-quality** waters for a parameter. Mont. Code Ann. § 75-5-103(5). **Degradation does not include those changes in water quality determined to be nonsignificant**. In other words, where changes in water quality are determined to be "nonsignificant", Montana exempts the

_____

[4]Numeric standards set specific, quantitative limits and must be applied to specific conditions and sets of circumstances. (R. 06746.) In the case of water quality, numeric standards address chemical and physical parameters or biological conditions. They are measurable and easily quantifiable and leave little room for interpretation.  They often, however, lack flexibility in implementation or achievement. Narrative standards are general statements that establish water quality goals.  Id.  Narrative standards provide a mechanism for a qualitative framework for monitoring, protecting, and maintaining water quality.  They may identify specific benchmarks which describe the quality of water needed to be able to use the water for a designated use.  Since narrative standards are for the most part guidelines, presented as general descriptions, they encompass significant latitude for interpretation.  They are typically established in the absence of scientifically based numeric standards or as a general framework within which numeric standards are defined.  Id.

11

changes from nondegradation review. Id.

The nondegradation policy is implemented through Montana's Administrative Regulations. Mont. Admin. R. § 17.30.701, et seq. Under the regulations, the nonsignificance thresholds apply to both numeric and narrative water quality standards. Mont. Admin. R. § 17.30.715. Parameters with numeric standards are categorized as carcinogenic, toxic or harmful and have numeric nonsignificance thresholds. Mont. Admin. R. § 17.30.715(1). In general, changes in water quality for a parameter designated as "harmful" are nonsignificant if they are less than 10% of the applicable numeric standard and the existing water quality is less than 40% of the standard. Mont. Admin. R. § 17.30.715(f). Parameters with narrative standards have narrative nonsignificance thresholds. Under the narrative standards, a change in water quality is nonsignificant if the quality of water for any parameter will not have a measurable effect on any existing or anticipated use or cause measurable changes in aquatic life or ecological integrity. Mont. Admin. R. § 17.30.715(1)(g). Again, changes deemed nonsignificant are not required to undergo nondegradation review.

## III. FACTUAL BACKGROUND

Since the early 1990's, coal bed methane has been a growing industry in

12

the Powder River Basin. (R. 02781-82.) The Powder River Basin contains large coal deposits which have methane gas trapped in the coal aquifers. Id. To release methane from a coal bed, water pressure that is trapping the gas in the coal needs to be lowered. Water wells are drilled into the coal seam and water is pumped out of the seam, causing the methane to detach from the coal and rise to the surface through the well casing.

A common method used to dispose of the water is to discharge it into ponds or existing stream channels. Id. There are four major rivers in the coal bed methane area in Montana. (R. 02781) Three of them -- the Tongue River, the Powder River and the Little Powder River -- originate in Wyoming. The fourth, Rosebud Creek, originates in Montana. Id.

The quality of the water discharged from the coal aquifer and into the rivers is of major concern. The dissolved constituents of coal aquifers vary widely. Two principal aspects of the water quality include the sodium adsorption ratio (SAR) and salinity. (R. 00174.) SAR adversely affects the physical properties of soil, resulting in deterioration of the soil's hydraulic characteristics such as permeability. Id. SAR is an expression of the concentration of sodium relative to the concentrations of calcium and magnesium in water. Salinity is indicated by electrical conductivity (EC). It

13

means the ability of water to conduct an electrical current. The EC of water represents the amount of total dissolved solids in the water and is expressed as microSiemens per centimeter (µS/cm), micromhos per centimeter (µmhos/cm), or as total dissolved solids, TDS, in units of mg/l. Id. EC directly affects a plant's ability to uptake water, while SAR affects the soils in which the plants grow. (R. 00226, 00235.)

In 2001, Montana had numeric standards for many attributes, or parameters. For other parameters, Montana had narrative standards. (R. 06746.) Montana did not have numeric standards for either SAR or EC. (R. 00175.) See also Pennaco Energy, Inc. v. Montana Bd. of Environmental Review, 199 P. 3d 191, 194 (Mont. 2008) ("Between 1972 and 2003, EC and SAR, among other parameters were regulated in Montana exclusively by narrative standards, as opposed to numeric standards.")

In the fall of 2002, in response to the significant development of coal bed methane (CBM) in Wyoming and Montana, the Montana Board of Environmental Review proposed the adoption of water quality standards which would include numeric levels of EC and SAR. The Board adopted numeric water quality standards for EC and SAR for the Tongue River, Powder River, and Little Powder River watersheds. (R. 00939.) The Board, however, continued to apply its

14

narrative component for determining whether changes in water quality caused by the coal bed methane discharges would be considered "significant" for purposes of the nondegradation review process. As noted above, when changes are not deemed "significant," Montana exempts the changes from nondegradation review. (R. 00943.) Consequently, the effect of adopting numeric criteria for the discharge of EC and SAR in 2003, but retaining the narrative "nonsignificant" criteria for nondegradation review of EC and SAR, was to potentially allow discharges that could degrade water quality up to the numeric water quality standard. Pennaco Energy, Inc. v. Montana Board of Environmental Review, 199 P.3d at 195.

The Board explained its reasoning behind retaining the narrative "nonsignificant" criteria for nondegradation review of EC and SAR:

[T]he nondegradation provision was established in recognition that significant increase of salinity levels occur throughout the year due to natural fluctuations of EC in the River. Since these fluctuations occur naturally, adopting a nondegradation requirement that allows only a de minimus change above existing quality will not prevent natural fluctuations of EC from going far beyond the de minimus value. Regardless, the nondegradation provision being adopted will maintain all designated and existing uses in compliance with state and federal law.

(R. 00961.) In response to a comment that EC and SAR should be designated as "toxic" parameters, and therefore subject to a more stringent nonsignificance

threshold, the Board reasoned:

> The Department has not conceded that EC and SAR should be classified as "harmful." Moreover, the Board does not agree that the rule should be changed to define EC and SAR as either "harmful" or "toxic." In MAR Notice No. 17-171, the Board explained that, given the natural fluctuations of EC and SAR in the Tongue and Powder River Basins, which often result in exceedances of the proposed numeric standards, the policy of maintaining existing "high quality" for these parameters is not justified. Regardless of the numeric threshold that could be imposed by the adoption of a 50% or 10% threshold, those thresholds will not prevent EC and SAR from naturally degrading water quality to the point where the numeric standards are exceeded. The Board also explained that imposing a numeric threshold based upon a percentage of the assimilative capacity would be virtually impossible to comply with or enforce. Given that slight changes in EC and SAR are extremely difficult to measure, a nonsignificance threshold based upon a percentage of the assimilative capacity would require continuous in-stream monitoring in order to distinguish between natural degradation and nonsignificant changes resulting from discharges. The impracticality of enforcing a numeric nondegradation threshold for these parameters argues persuasively against the adoption of such thresholds.

(R. 00953.)

## IV. EPA APPROVAL OF MONTANA'S 2003 WATER QUALITY STANDARDS

Montana submitted the 2003 numeric standards to the EPA for review on

June 12, 2003. (R. 00939-66.) On August 28, 2003, the EPA approved the

standards. (R. 00983-91.) The EPA supported its approval as follows:

> Water quality standards for EC and SAR are needed to

16

address current and projected development of coal bed methane (CBM) within the Tongue River, Powder River and Little Powder River Watersheds. Irrigated agriculture is likely the beneficial use most sensitive to development of CBM and the associated discharge of produced water, and for that use, the two principal constituents of concern in CBM water are EC and SAR. Our review of the new water quality standards, therefore, focused on the protectiveness of those standards as applied to irrigated agricultural uses in these basins.

I am pleased to inform you that today EPA is approving the numeric water quality standards and nondegradation requirements for EC and SAR for the Tongue River, Powder River and Little Powder River Watersheds. Based on our review of the available science on this topic, including a technical evaluation of the standards by the U.S. Department of Agriculture's Salinity Laboratory, EPA believes the final EC and SAR standards provide a reasonable assurance that irrigated agriculture and other designated uses applicable to these basins will be protected. EPA has concluded that these revisions to the Surface Water Quality Standards, Sub-Chapters 6 and 7, are consistent with the requirements of the Clean Water Act and EPA's implementing regulation at 40 CFR Sections 131.11 and 131.12. Accordingly, these revisions are approved. The new definitions for electrical conductivity and sodium adsorption ratio, added to Sub-Chapter 6, are approved as well. The basis for EPA's action is presented in an enclosed rationale document.

(R. 00983-84.)

## V.    EPA APPROVAL OF MONTANA'S 2006 WATER QUALITY STANDARDS

In May 2005, the Montana Board of Environmental Review received a

petition for additional rulemaking. The petition asked the Board to amend

17

Mont. Admin. R. § 17.30.670(6) to designate EC and SAR as harmful

parameters.  (R. 05168.)  On March 23, 2006, the Board amended ARM

17.30.670 and 17.30.1202 and designated EC and SAR as "harmful"

parameters.  Id.  When EC or SAR is deemed significant under the "harmful"

category, an applicant must obtain authorization to degrade prior to

discharging.  (R. 09247.)  The Board adopted the "harmful" category as a

means to determine significant changes in existing quality rather than as a

standard to protect uses.  Id.  Under the new rule, the DEQ could not authorize

a discharge exceeding 10% of the numeric standard without an authorization

to degrade.  Id.  Also, if the ambient water quality in the stream is 40% of the

standard or above, no additional discharge could occur without an authorization

to degrade.  Id.

The EPA approved the revised 2006 standard on February 29, 2008.  (R.

10868.)  The EPA's basis for approval stated:

> In the revision to ARM 17.30.670(6) at issue, the Board has
> determined that EC and SAR are "harmful" parameters for the
> purposes of making nonsignificance determinations for high quality
> waters.  There is evidence in the record that EC and SAR may be
> harmful to plants and soils, and therefore harmful to irrigated
> agriculture, the most sensitive designated use for these two
> parameters in the Tongue River, Powder River and Little Powder
> River Basins.  Indeed, the Board's adoption of numeric water
> quality criteria for EC and SAR in 2003, developed to protect

irrigated agriculture, is an acknowledgment that these parameters may adversely affect the attainment of that use. Further, Montana's nondegradation significance threshold applies to all other parameters for which the Board has adopted numeric criteria. By establishing a nondegradation significance threshold for EC and SAR, the Board's action brings EC and SAR in line with all other parameters for which Montana has developed numeric criteria, and appropriately focuses future EC and SAR nondegradation reviews on avoiding significant changes to water quality on high quality waters.

The revision to ARM 17.30.670(6), although not a change to the State's nondegradation rule itself, changes the manner in which the State's nondegradation provisions will be applied to EC and SAR in the Tongue River, Powder River, Little Powder River Basins, by removing a previous exemption from degradation considerations for these two parameters. The previous version of ARM 17.30.670 (6) was approved by EPA with a letter to the Board dated August 28, 2003. In the course of considering the revision to Montana's nondegradation rule that is now before us, EPA has reviewed both the administrative record EPA considered when making the decision on August 28, 2003, to approve Montana's nondegradation rule, and all relevant information the Agency reviewed subsequent to that decision. This review included review of the public comments received by the State of Montana and the testimony in public hearings held regarding Montana's 2003 and 2006 revisions. EPA also considered documents added to EPA's administrative record for the 2003 standards approval by the United States District Court for the District of Wyoming. This review confirmed that the provisions approved by EPA on August 28, 2003 were within a range of options considered by EPA to be consistent with 40 CFR Section 131.12, and therefore were appropriately deemed acceptable by EPA. The newly amended ARM 17.30.670(6) simply makes application of nondegradation to EC and SAR consistent with Montana's statewide approach. As discussed above, that revision is also within a range of options considered by EPA to be consistent with 40 CFR 131.12. As a result, EPA approves Montana's revision.

(R. 10870-71.)

## VI.   STANDARD OF REVIEW

Section 706 of the Administrative Procedure Act articulates the district

court's scope of review of the EPA's final agency action approving the 2003 and

2006 regulations:

> . . . [T]the reviewing court shall decide all relevant questions
> of law, interpret constitutional and statutory provisions, and
> determine the meaning or applicability of the terms of an agency
> action.  The reviewing court shall–
>
> *    *    *
>
> (2) hold unlawful and set aside agency action, findings, and
> conclusions found to be--
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise
>> not in accordance with law;
>> (B) contrary to constitutional right, power, privilege, or
>> immunity;
>> (C) in excess of statutory jurisdiction, authority, or
>> limitations, or short of statutory right;
>> (D) without observance of procedure required by law;
>> (E) unsupported by substantial evidence . . . .
>
> In making the foregoing determinations, the court shall review the
> whole record or those parts of it cited by a party, and due account
> shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.  The Tenth Circuit explained the arbitrary and capricious review

standard under section 706 as follows:

> The scope of our review under the "arbitrary or capricious"

standard is narrow and we are not to substitute our judgment for that of the agency.  We confine our review to ascertaining whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made. In reviewing the agency's explanation, we must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment.  Agency action will be set aside if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Because the arbitrary and capricious standard focuses on the rationality of an agency's decision making process rather than on the rationality of the actual decision, it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.  Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record.  The agency must make plain its course of inquiry, its analysis and its reasoning.  After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles.

Colorado Wild, Heartwood v. U.S. Forest Service, 435 F.3d 1204, 1213 (10th

Cir.  2006) (internal citations omitted).

## VII.  DISCUSSION

### A.   APPROVAL OF 2003 NUMERIC STANDARDS

#### 1.   FAILURE TO CONSIDER ENTIRE ADMINISTRATIVE RECORD

The State of Wyoming and Industry insist the EPA's approval of the 2003 numeric standards must be reversed because the EPA failed to consider the entire administrative record. These Petitioners urge the Court to reverse the EPA's approval of the 2003 standards and remand the matter to the EPA with instructions to consider the complete 2003 administrative record of the Montana Board of Environmental Review.

At the request of several Petitioners, on October 2, 2006, the Court ordered that 47 documents be added to the administrative record. (Docket no. 101.) The Petitioners argued that the administrative record filed by the EPA on June 26, 2006 did not include documents and information from the coal bed natural gas industry which were designated by the Montana Board of Environmental Review as part of the State of Montana's rulemaking proceedings. (Docket no. 96.) Although the EPA asserted that 11 of the documents were not part of Montana's administrative process, the EPA did not oppose the addition of 30 documents which were, in the EPA's words, "primarily public comments submitted directly or indirectly to the State of Montana's Board of Environmental Review . . . in connection with the State's adoption of the water quality standards." (Docket no 122, p. 2, n. 1.) The EPA, therefore, did not contest the addition of documents 1-9, 11-12, 14, 17-19, 22, 25-31,

22

33, and 41-43, 45-47 attached to the Petitioners' Memorandum in Support of their Motion to Add Documents Omitted from the Administrative Record. (Docket no. 122, p. 10.)

Documents 1-9, 11-12, 14, 17-19, 22, 25, 26, 26(a) - (c), 27-31, 33, and 41-43 include transcript testimony from representatives of the coal bed methane industry and minutes from the Board of Environmental Review summarizing the testimony. The testimony expressed concern that the Montana numeric standards are not scientifically sound and impose unreasonable SAR and EC levels in light of the naturally high salinity of the rivers. The documents also include substantial expert opinions and technical reports as to the irrationality of the standards in light of the natural conditions of the rivers and the necessity for further study. There are additionally substantive comments evidencing the suitability of coal bed methane water for irrigation and livestock. (Docket no. 98, attachment E, documents 1-9, 11-12, 14, 17-19, 22, 25, 26, 26(a) - (c), 27-31, 33, 41-43.)

The Petitioners maintain that the documents excluded from the record are documents which demonstrate that the Montana standards are not scientifically sound. (Docket no. 98, p. 10.) The EPA responds that even though it did not review each of the hundreds of written comments submitted to Montana, to the

extent such failure was error, it was harmless error that does not warrant remanding the EPA's approval decision.  The EPA argues that the administrative record reflects that the EPA was aware of the positions and supporting evidence of the stakeholders in Montana's development of numeric water quality standards for EC and SAR.

The EPA points out that a staff member from the EPA attended various meetings concerning Montana's proposed new standards, including initial working group sessions.  For example, meeting notes in February 2001 reflect that a staff member from the EPA in Helena was present.  (R. 00095.)  The EPA elaborates that an EPA staff member apparently attended a presentation made by an expert of Montana Coalbed Natural Gas Alliance.  (R. 00327-41.) Apparently the same staff person (Ron Steg) participated in collaborative meetings.  (R. 00503.)  Finally, the EPA emphasizes that most importantly, "it reviewed Montana's summary of significant comments it received and Montana's response to those comments."  (Docket no. 194, p. 32 (citing R. 953-63.))  The EPA concludes that because it was fully apprised of all positions presented during Montana's administrative process, it "did not need to receive and read every written comment submitted to the Montana DEQ to satisfy the [Clean Water Act]."  (Docket no. 194, p. 22.)  The EPA relies on Safari Aviation,

Inc. v. Garvey, 300 F.3d 1144, 1151-52 (9th Cir. 2002) to support its position.

In Safari Aviation, Inc., the Court held that the FAA's failure to examine four comments was harmless where the issue had been previously discussed in rulemaking proceedings. Safari Aviation, Inc., however, involved rulemaking proceedings conducted by a federal agency, rather than a state agency, over the course of six years. In the process of the rulemaking, the FAA published more than 200 public comments. The Court finds that Safari Aviation, Inc. is a much different situation than the present.

The EPA's position is essentially that a staff member acted as an ex-officio participant in the rulemaking process and through this process, conducted the necessary EPA review of Montana's 2003 revisions. This argument overlooks the EPA's role in approving water quality standards. It is clear that the EPA's role in the establishment of water quality standards is limited. City of Albuquerque v. Browner, 97 F.3d at 415, 424 (10th Cir. 1996). The EPA has a non-rulemaking role and the public participation occurs during the state comment period. Id. The Clean Water Act does not evidence "any intent that EPA involve itself in the details or substance of the process . . . ." Id. at 425. However, all comments submitted to a state become part of the administrative record and are reviewed by the EPA in determining whether to approve the

state's proposed standards. Id.

The Court agrees that the EPA had a critical obligation to consider the entire record. The documents omitted from the record contained information which was of great importance to the Petitioners because the information provided scientific evidence and opinions, as well as commentary, that the numeric values adopted by Montana were not based on sound science. The Court is not persuaded that because an EPA staff member attended various hearings and was involved throughout Montana's administrative review process, the agency should be relieved of its responsibility to review all the comments. The EPA itself noted that the issues involved "are complex, the science for some key factors imperfect, and the data on the existing conditions incomplete." (R. 00575.) The administrative record shows that the development of numeric standards is complicated by numerous scientific uncertainties and is further complicated by the relationship between SAR and salinity, the chemistry of the irrigation water, the type and age of the plant to be irrigated, the texture of the soils, and water management practices. (R. 00175.)

The record is replete with varying opinions and conclusions as to the effect of coal bed methane water and the appropriateness of Montana's 2003 numeric standards. It is exactly in this situation that the EPA had an obligation

26

to objectively review all the comments and opinions. The EPA suggests that failing to consider the omitted documents is harmless. The Court finds the argument unpersuasive because the unique circumstances of this case involve scientific data which is not only complex, but incomplete and evolving. Although the EPA repeatedly asserts that it recognizes the positions of the stakeholders, mere recognition of positions does not fulfill the EPA's statutory and administrative duties. The EPA must fulfill its obligations to fully consider the entire administrative record. Because it has not done so, this matter should be remanded to the EPA to consider the entire 2003 administrative record.

### 2. FAILURE TO COMPLY WITH 33 U.S.C. § 1313 AND 40 C.F.R. § 131

### a. FAILURE TO ARTICULATE RATIONAL ANALYSIS

The Petitioners contend that the EPA's approval of the 2003 numeric standards violated the "sound science" requirement of 33 U.S.C. § 1313 and 40 C.F.R. § 131[5] because the EPA failed to provide a rational analysis for approving

_____

[5]Section 131.5(a)(4) states that:

> (a) Under Section 303(c) of the Act, EPA is to review and to approve or disapprove State-adopted water quality standards. The review involves a determination of:
>> 4) Whether the State standards which do not include the uses specified in Section 101(a)(2) of the Act are based upon appropriate technical and scientific data and analyses . . . .
> The uses specified in section 101(a)(2) of the Clean Water Act include

27

the 2003 revised numeric standards and an analysis of the supporting scientific evidence.

The EPA agrees that the regulation, 40 C.F.R. § 131, identifies five factors the EPA must employ in reviewing a state's water quality criteria. (Resp't U.S. Environmental Protection Agency's Proposed Findings and Conclusions of Law at 29 (citing 40 C.F.R. § 131.5(a)). The EPA further agrees that the factors relevant to this case include whether the state adopted criteria that protect the designated water uses and whether the state adopted criteria which are based upon appropriate technical and scientific data and analysis. Id. (citing 40 C.F.R. § 131.5(a)(2),(4)).

The EPA's approval advised the State of Montana that:

. . . Based on our review of the available science on this topic, including a technical evaluation of the standards by the U.S. Department of Agriculture's Salinity Laboratory, EPA believes the final EC and SAR standards provide a reasonable assurance that irrigated agriculture and other designated uses applicable to these basins will be protected. EPA has concluded that these revisions to the Surface Water Quality Standards, Sub-Chapters 6 and 7, are consistent with the requirements of the Clean Water Act and EPA's implementing regulation at 40 CFR Sections 131.11 and 131.12.

_____

propagation of fish, shellfish, and wildlife and recreation. 33 U.S.C. § 1251(a)(2).

28

Accordingly, these revisions are approved. The new definitions for electrical conductivity and sodium adsorption ratio, added to Sub-Chapter 6, are approved as well. The basis for EPA's action is presented in an enclosed rationale document.

(R. 00983-84.) The rationale document similarly articulated that:

Based on our review of the available science on this topic, including a technical evaluation of the standards by the U.S. Department of Agriculture's Salinity Laboratory, EPA believes the final EC and SAR standards provide reasonable assurance that irrigated agriculture and other designated uses applicable to these basins will be protected.

(R. 00989.)

The Court finds that the EPA's conclusory explanation fails to disclose the grounds upon which the EPA acted. The EPA must make plain its course of inquiry, its analysis and its reasoning. Olenhouse v. Commodity Credit Corp., 42 F.3d at 1560, 1575 (10th Cir. 1994). Although the EPA stated that it, "considers the addition of maximum values for EC and SAR to be a key component of the final standards", (R. 00988), the EPA failed to identify the scientific basis for approving a standard which oftentimes will be **less than** the naturally occurring condition. For example, as the State of Wyoming points out, the Little Powder River has a mean EC of 2337 μS/cm during irrigation season. (R. 02495.) The natural condition is consequently greater than the 2000 μS/cm monthly average permitted by the State of Montana under its new regulations.

29

(R. 00932, 00987.) Similarly, the median SAR of 5.2 in the Little Powder River during irrigation season is greater than the permissible monthly average of 5, which was approved by the EPA. (R. 00932, 00987.) Likewise, the Powder River's natural maximum EC during irrigation season is 5000 µS/cm, yet the 2003 numeric maximum is limited to 2500 µS/cm. (R. 00932, 00987.)

The EPA's letter of approval and the attached 5-page enclosure adequately details the statutory process for approving the numeric standards. (R. 00983-00991.) The letter and enclosure, however, do not address the crux of the controversy -- whether the final adopted EC and SAR values are supported by appropriate scientific and technical data. Arriving at appropriate values unquestionably involves numerous scientific uncertainties. Very little is known about the impact of salt or sodicity on forage quality. (R. 06727.) The parties presented extensive scientific information to support their respective positions. The EPA simply has failed to articulate the basis for its action approving the adoption of these precise numeric values and has failed to make plain its course on inquiry and reasoning. Olenhouse, 42 F.3d at 1575; 40 C.F.R. § 131.5(a)(4).

The EPA advises the Court that the foundational document providing the basis for the 2003 standards is Montana's Department of Environmental

30

Quality's July 22 report entitled, "Technical Basis for Draft EC and SAR Standards". (Brief of Resp't U.S. Environmental Protection Agency at 28.) In its approval letter, however, the EPA does not state that it relied on the report and does not reference the report. The Court notes that in a March 2003 e-mail from the EPA to Dr. Suarez, the EPA confirmed its uncertainty with respect to the actual "numbers" the State of Montana proposed to adopt.[6] (R. 00847.) It appears that the uncertainty continued into the final EPA approval, as the EPA failed to explain the approval of the final numeric limits. The EPA's general finding that scientific data supports the numeric values is purely conclusory and by itself is insufficient to allow the Court to determine whether the EPA's approval was the product of reasoned decision making. Olenhouse, 42 F.3d at 1575.

States have the primary role, under 33 U.S.C. § 1313, in establishing water quality standards.    American Wildlands, 260 F.3d at 1194.  EPA's sole function, in this respect, is to review those standards for approval. Id. Congress clearly intended the EPA to have a limited, non-rulemaking role in the establishment of water quality standards by states. Id. The Court notes,

_____

[6]The e-mail also evidences the extent to which the EPA was attempting to influence the State of Montana's regulations even though it was still uncertain as to the scientific basis for the proposed standards. (R. 00847.)

however, that the EPA's statutory duty is not to review whether the Montana
Board of Environmental Review or the Montana Supreme Court found that the
standards are in accordance with the Clean Water Act.  If this were the case,
there would be no need for review by the EPA.  Rather, the EPA must act
objectively and independently and make its own determination.  In so doing,
it must explain its reasoning.  Unfortunately, the EPA has merely advised all
those interested in this matter that the EPA does not disagree with conclusions
reached by the Montana Board of Environmental Review.  This matter should
accordingly be remanded for the EPA to be given an opportunity to clearly
explain whether appropriate scientific data supports the specific actual numeric
values adopted by the State of Montana.

### b.   FAILURE TO DETERMINE WHETHER STANDARDS ARE BASED ON APPROPRIATE TECHNICAL AND SCIENTIFIC DATA

The Petitioners vehemently remonstrate that not only did the EPA fail to
articulate its rationale for approving the 2003 standards, the EPA erred in its
determination that the 2003 standards were based upon appropriate technical
and scientific data.  The EPA responds that it did review the scientific and
technical data basis for the 2003 standards and that it correctly found them to

32

be adequate.[7]  The Court is not persuaded by the EPA that it did conduct the
required review.

Industry faults the EPA in failing to determine whether a scientific basis
exists for adopting numeric standards which are often exceeded in natural
conditions.  (R. 04644-45.) Industry also points out, for example, that the
Montana Board of Environmental Review assumed a leaching fraction of 30%
in the Powder River Valley based on the general use of flood irrigation, while
assuming a leaching fraction of only 15% in Tongue River based on the use of
sprinkler irrigation.  (R. 02498.) The Board, however, simultaneously noted
that sprinkler systems are relatively rare in the Tongue River basin and most
of the irrigation is done with flood irrigation.  Id.  The Board itself made these

_____

[7]The EPA also fleetingly asserts that under City of Albuquerque, 97 F. 3d at 426, if state
standards are more stringent than necessary to comply with the Clean Water Act, the EPA
may approve the standards without reviewing the scientific data.  In City of Albuquerque,
97 F.3d at 426, the Tenth Circuit did state that if proposed standards "are more stringent
than necessary to comply with the Clean Water Act's requirements, the EPA may approve
the standards without reviewing the scientific support for the standards." The appellate
court referenced a 1977 decision from the Seventh Circuit which expansively expounded
that, "Only the federal effluent limitations must be technology-based, and they represent
the minimum level of pollution reduction required by the Act." U.S. Steel Corp. v. Train,
556 F.2d 822, 838 (7th Cir. 1977), overruled on other grounds by City of West Chicago,
Ill. v. U.S. Nuclear Regulatory Comm'n, 701 F.2d 632, 644 (7th Cir.1983).  City of
Albuquerque, however, broadly focused on the general requirements of the Clean Water
Act and did not investigate the specific requirements of 40 C.F.R. § 131.5.  The Court
believes that in a specific analysis of section 131.5, the Tenth Circuit would find that the
EPA was required to determine whether the 2003 standards are based upon appropriate
technical and scientific data and analyses.

33

assumptions based on personal communications with a soil specialist at the University of California and unpublished Department of Environmental Quality data. (R. 02508, n. 3 and 4.) The differing leaching fractions resulted in a substantially higher EC limit of 2000 µS/cm for the Powder River, compared to the 1000 µS/cm for the Tongue River. (R. 00932, 02498, 02506.)[8]

The Court agrees that the EPA's 2003 approval did not evidence that it considered the Industry's legitimate concerns as to the lack of scientific basis for the numerical standards Montana has adopted. The Court therefore finds that this matter should also be remanded to the EPA to conduct the analysis required by 40 U.S.C. § 131.5(a)(4) and to determine whether the 2003 numeric standards are based upon appropriate technical and scientific data and analyses.

### 3. FAILURE TO PROVIDE NOTICE AND COMMENT

Industry contends that the EPA's approval of the 2003 standards violated the APA by failing to provide notice and comment on information the EPA received after 2003. Industry claims that the EPA gathered information and

---

[8]The Court is not convinced by Industry's persistence that the EPA must determine whether the revised numerical EC and SAR standards were "necessary". Industry cites to no regulatory or other authority for this position. The appropriate determination is set forth in 40 C.F.R. § 131.5. Nor is the Court convinced by Industry that the Board "ignored" data provided by Wyoming. The record cites provided do not support the accusation.

considered studies after 2003 and then relied on the additional information to "confirm" the approval of the 2003 revised standards.

In its 2006 letter of approval, the EPA noted that in the course of considering the 2006 nondegradation rule, the EPA reviewed the 2003 administrative record, all relevant information received subsequent to the decision, including testimony at the 2006 public hearings. The Court agrees that to the extent the EPA was attempting to "cure" or "confirm" its earlier decision, it may not do so in this manner. Montana's hearings and proceedings involving the 2006 nondegradation rule did not provide for notice and comment with respect to the 2003 water quality standards. The EPA, therefore, cannot "cure" a prior error by reconsidering information and public comment with respect to an entirely different rule. To do so would negate the public's role in the notice and comment process which is provided at the state level.

## B.   APPROVAL OF 2006 NONDEGRADATION STANDARD

### 1.   FAILURE TO EXPLAIN BASIS FOR APPROVAL

The Petitioners argue that the EPA acted arbitrarily and capriciously in failing to explain the basis for approving the 2006 nondegradation standard.[9]

---

[9] The State of Wyoming also argues that the EPA failed to comply with 40 C.F.R. § 131.5(a)(4) by requiring a scientific basis for the standards. As explained by the State of Montana, however, 40 C.F.R. § 131.5(a) sets forth the EPA's review with respect to water

The Court agrees that the EPA failed to provide a reasoned explanation for its

approval of the 2006 nondegradation standard. The Tenth Circuit reiterated in

Arizona Public Service Co. v. United States Environmental Protection Agency,

562 F.3d 1116, 1123 (10th Cir. 2009), that the Court must determine whether

the agency considered the relevant data and rationally explained its decision.

Id. (citing Olenhouse, 42 F.3d at 1574). The EPA approved the 2006 revised

standards because, "its review confirmed that the provisions approved by EPA

on August 28, 2003 were within a range of options considered by EPA to be

consistent with 40 CFR Section 131.12, and therefore were appropriately

deemed acceptable by EPA." (R. 10870.) This statement is no more than a

conclusion. It fails to identify the basis for approving the changes and fails to

provide any basis from which the Court can reasonably discern the agency's

decision making process. The EPA further justifies its approval on the basis that

there is evidence in the record that EC and SAR **may** be harmful to plants and

soils, and therefore harmful to irrigated agriculture and because Montana's

adoption of numeric water quality criteria for EC and SAR in 2003 "is an

_____

quality standards. 40 U.S.C. § 131.12 sets forth the requirements for approval of an
antidegradation policy and does not require the EPA to determine whether the policy is
based on appropriate technical and scientific data and analyses.

acknowledgment that these parameters **may** adversely affect the attainment of that use." Approving a state standard on the basis that a parameter **may** be harmful is certainly not what the Clean Water Act envisioned. This rationale hardly evidences a consideration by the EPA of relevant data and important aspects of designating EC and SAR as harmful parameters.

The adoption of the 2006 nondegradation standards is of great importance in both Montana and Wyoming. The EPA must not only review the standards to ensure they are consistent with the Clean Water Act, it must also provide a reasoned explanation for its action. The EPA must make plain its course of inquiry, its analysis and its reasoning. Olenhouse v. Commodity Credit Corp., 42 F.3d at 1576. Although the scope of review is narrow, the agency must nevertheless "explain the evidence which is available, and must offer a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

The EPA's explanation for its approval of the 2006 nondegradation revisions fails to identify a rational connection between the facts and its approval. In fact, the explanation provided, that EC and SAR **may** be harmful and that Montana's 2003 adoption of water quality criteria for EC and SAR is an

acknowledgment that these parameters **may** have adverse effects, evidences that the EPA's approval was in fact arbitrary and capricious. The Court consequently finds that the matter should be remanded to the EPA to make plain its course of inquiry, its analysis and its reasoning for approving the 2006 nondegradation standards.

## 2. EPA APPROVAL OF NONDEGRADATION STANDARDS FOR THE POWDER RIVER AND LITTLE POWDER RIVER

In its February 29, 2008 letter approving Montana's revised nondegradation provisions, the EPA stated that, "The revised quality standards amend Montana's nondegradation requirements applicable to electrical conductivity (EC) and sodium adsorption ratio (SAR) for the Tongue River, Powder River and Little Powder River Basins." Anadarko Petroleum Corporation and Williams Production RMT Company point out, however, that only "high quality" waters are protected under Montana's nondegradation policy. Mont. Admin. R. § 17.30.705(2)(b). In fact, in response to a public comment, the Montana Board of Environmental Review advised that "for EC and SAR the Powder River is not a 'high quality' water that is protected under Montana's nondegradation policy." (R. 09328, 09382.) Anadarko and Williams complain that the EPA's approval is consequently arbitrary and inconsistent with the

38

administrative record, as the EPA approval letter purports to extend the nondegradation requirements to the Powder River and Little Powder River. The EPA retorts that the statements in its 2008 approval letter do not constitute an approval of any classification of waters by Montana as Tier I or Tier II. The EPA informs the Court that it does not approve a classification for a waterbody as Tier I or Tier II unless a state includes the classification in its water quality standard.

The Court recognizes the legitimacy of both arguments. Although the EPA did not approve classification of the Powder River and Little Powder River, the letter of approval is ambiguous with respect to the application of the nondegradation provisions to those rivers. The Court therefore finds that on remand, the EPA should clarify in its explanation that it is not approving the classification of the Powder River and Little Powder River as Tier II.

## C. IMPAIRMENT OF JURISDICTION OF STATE OF WYOMING AND CONSTITUTIONAL ISSUES

The Petitioners proffer that section 101 and 510 of the Clean Water Act (33 U.S.C. §§ 1251 and 1370) preserve a state's jurisdiction over the waters within the state. The Petitioners stress that Congress did not intend for states to infringe on the primary jurisdiction of other states and that neither section

39

101 nor 510 allows a state to impose its standards on another state. The Petitioners suggest that the State of Montana can therefore promulgate standards which are more stringent than the Clean Water Act requires, but that the EPA may not require the application of those standards to an upstream state. The Petitioners tender the Supreme Court's decision in Int'l Paper Co. v. Ouellette, 479 U.S. 481, 483 (1987) in support of their argument. The Petitioners further theorize that the EPA's approval of standards which are more stringent than required by the Clean Water Act encroaches upon Wyoming's state sovereignty in violation of the Tenth Amendment. Finally, the Petitioners urge the Court to find that Montana's water quality standards violate the Dormant Commerce Clause of the United States Constitution.

It would be premature for the Court to address these issues. Arguably, standards properly approved and based on appropriate scientific data would be consistent with the Clean Water Act and able to withstand constitutional challenge. In a similar vein, it would be premature for the Court to address the State of Wyoming's argument that it is not required under the Clean Water Act to include conditions in discharge permits to ensure compliance with the Montana 2003 and 2006 standards.

## VIII.    ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1)    The Court **VACATES** the EPA's approval of Montana's 2003 and 2006 water quality standards.

2)    The Court **REMANDS** this matter to the EPA to:

a)    Consider the entire 2003 administrative record;

b)    Determine whether the 2003 numeric standards are based on appropriate technical and scientific data; and

c)    Make plain its course of inquiry, analysis and reasoning for its action as to the 2003 and 2006 standards, including whether appropriate scientific data supports the actual numeric values adopted by the State of Montana; and

d)    Clarify that the EPA is not approving classification of the Powder River and Little Powder River as Tier II.

Dated this _4_ day of ___October___, 2009.

_Larence A. Brimmer_

UNITED STATES DISTRICT JUDGE

41